STEPHEN B.,

      **Plaintiff,**

      **v.**                           **Case No. 24-CV-1647**

**FRANK BISIGNANO,**
**Commissioner of Social Security,**

      **Defendant.**

## DECISION AND ORDER

Stephen B. (hereinafter "Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying in part his Title II application for a period of disability and disability insurance benefits. For the reasons below, the Commissioner's decision will be reversed and the case remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

On June 22, 2020, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning on August 29, 2019, due to neck and lower back pain; arthritis; bulging discs in the neck and back; high blood pressure; depression; and attention deficit disorder ("ADD"). (Tr. 198.) Plaintiff's claims were denied initially and upon reconsideration. (Tr. 13.) Plaintiff filed a request for a hearing, and a telephone hearing was held before Administrative Law Judge ("ALJ") Patrick Berigan on December 20, 2021. (Tr. 30–60.) Plaintiff, represented by counsel, testified, as did Kari Seaver, a vocational expert ("VE"). (*Id.*)

ALJ Berigan issued an unfavorable decision on January 12, 2022. (Tr. 13–25.) The Appeals Council denied Plaintiff's request for review (Tr. 1–5), and Plaintiff filed a complaint in federal court challenging the Administration's finding of non-disability (Tr. 1344–46). The parties stipulated to remand the case to the Administration for further proceedings, and the case was remanded on March 29, 2023. (Tr. 1346.) Upon remand, Plaintiff's case was assigned to ALJ Arman Rouf, who held a new hearing on April 22, 2024. (Tr. 1288–1317.) Once again, Plaintiff, represented by counsel, testified, as did Thomas Heiman, a VE. (*Id.*) ALJ Rouf issued a partially favorable decision on August 30, 2024, finding Plaintiff disabled beginning on March 29, 2023. (Tr. 1278.) ALJ Rouf explained that on March 29, 2023, Plaintiff's age category changed from a "younger individual" to an "individual closely approaching advanced age" and considering Plaintiff's age, education, work experience, and residual functional capacity ("RFC"), as of that date, Plaintiff was disabled under Medical-Vocational Rule 201.10. (Tr. 1277.)

However, ALJ Rouf rejected Plaintiff's claim of disability from his alleged onset date of August 29, 2019, through March 28, 2023. (*Id.*) The ALJ found that since the alleged onset date, Plaintiff had the severe impairments of degenerative disc disease of the cervical and lumbar spine, osteoarthritis of the left knee and left hip, peripheral neuropathy, myofascial pain syndrome, obesity, major depressive disorder, attention deficit hyperactivity disorder ("ADHD"), generalized anxiety disorder, social anxiety disorder, and alcohol use disorder. (Tr. 1263.) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 1264–66.) The ALJ concluded that Plaintiff had the RFC to perform sedentary work, with the following limitations: he can occasionally climb

2

ramps and stairs, balance, stoop, kneel, crouch, and crawl; he can never climb ladders, ropes, or scaffolds; he can occasionally reach overhead with the bilateral upper extremities; he can frequently push, pull, or operate foot controls with the bilateral lower extremities; he must avoid unprotected heights and dangerous moving machinery; he can understand, remember, and carry out simple instructions; he can maintain attention, concentration, persistence, and pace for two-hour segments; he can use judgment to make simple work-related decisions; he can deal with occasional changes in a routine work setting; and he can occasionally interact with supervisors, co-workers, and the public. (Tr. 1267–75.)

While ALJ Rouf determined that Plaintiff could not perform his past relevant work as an asphalt spreader operator, he found that given Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could have performed prior to March 29, 2023. (Tr. 1275.) Specifically, the ALJ found Plaintiff could perform the occupations of document preparer, microfilming, of which there were 20,000 jobs nationally; lens inserter, of which there were 14,000 jobs nationally, and final assembler, optical goods, of which there were 4,000 jobs nationally. (Tr. 1276.) Accordingly, the ALJ found that Plaintiff was not disabled from his alleged onset date through March 28, 2023. (1277.) Plaintiff then appealed ALJ Rouf's decision to federal court pursuant to 20 C.F.R. § 404.984 and 42 U.S.C. § 405(g). (Docket # 15 at 2.) Plaintiff now seeks review of ALJ Rouf's finding of non-disability prior to March 29, 2023. (*Id.* at 4.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v.*

*Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

       *2.     Application to this Case*

Plaintiff argues ALJ Rouf made multiple errors in finding him not disabled prior to March 29, 2023. First, he argues the ALJ erred at step five when determining that a significant number of jobs existed in the national economy that Plaintiff could have performed. (Docket # 15 at 4–10.) Second, Plaintiff argues that ALJ Rouf failed to consider Plaintiff's reports of problems sitting in limiting him to sedentary work and failed to explain how the evidence supported a limitation in overhead reaching, but not reaching in any other direction. (*Id.* at 10–15.) Third, Plaintiff challenges the determination of his mental RFC, arguing that ALJ

Rouf failed to indicate what issues caused his moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at 15–19.) And finally, Plaintiff argues the ALJ failed to consider certain factors as required by the regulations in evaluating Plaintiff's subjective symptoms. (*Id.* at 19–31.) I will address each argument in turn, but will address Plaintiff's step five argument last.

### 2.1 The ALJ's Physical RFC Finding

Plaintiff argues the ALJ erred by failing to address his difficulties with prolonged sitting when assessing his RFC. (Docket # 15 at 11), as well as by failing to explain why Plaintiff was limited to overhead reaching but not reaching in other directions (*id.* at 13–15).

#### 2.1.1 Failure to Address Sitting Limitation

ALJ Rouf limited Plaintiff to performing sedentary work, and sedentary work generally requires sitting for a total of about six hours of an eight-hour workday. Social Security Ruling ("SSR") 96-9p, 1996 WL 374185, at *3. Plaintiff argues, however, that the ALJ failed to discuss any of the evidence regarding his problems with prolonged sitting. (Docket # 15 at 11.) I agree. The record indicates that in August 2019, Plaintiff reported to his treating physician, Dr. Daniel Lemkuil, that he was experiencing increasing lumbar pain and that "[s]itting is the worst." (Tr. 430.) He similarly reported to his physical therapist that month that he had difficulty sitting for over 30 minutes. (Tr. 364.) Plaintiff was subsequently referred for pain management treatment to nurse practitioner Megan Brzezinski, APNP, who noted that Plaintiff experienced widespread pain that was made worse with any sitting and that he needed to change positions often. (Tr. 266.) In March 2020, Brzezinski referred Plaintiff to nurse practitioner Esmaeil Kamali, APNP, for a neurological consultation, who noted that Plaintiff reported prolonged sitting made his symptoms worse and that he

constantly needed "to keep weight off of [ ] his left buttock area to get some relief." (Tr. 329.) During physical therapy in July, Plaintiff noted that he had difficulty and discomfort sitting due to his hips and knees. (Tr. 421.) During his annual examination with treating nurse practitioner Kristin Collar, APNP, she noted that Plaintiff appeared uncomfortable and was moving throughout the examination. (Tr. 768.)

On January 30, 2021, Plaintiff underwent a medical evaluation with Dr. A. Neil Johnson. (Tr. 843–46.) Plaintiff reported that he "is always moving about" when sitting and that he did not like to sit still, even when driving. (Tr. 843.) Upon physical examination, Dr. Johnson noted that Plaintiff was "in a fair amount of pain" and was "very stiff in getting up." (Tr. 844.) Plaintiff underwent a functional capacity evaluation with occupational therapist Troy Gutzman on November 15, 2021. (Tr. 1179.) Plaintiff reported to Gutzman that "prolonged sitting [was] by far his hardest activity" and Gutzman observed that during the test, Plaintiff avoiding sitting, decreased weight bearing on the left leg, and would sigh and have difficulty getting into and out of position. (Tr. 1180.) Gutzman opined that Plaintiff could sit "occasionally" (Tr. 1186), which was defined as up to one-third of the day (Tr. 1189). The same day, Plaintiff's treating nurse practitioner Kristin Collar, APNP, opined that Plaintiff required a job that permitted shifting positions at will from sitting, standing, or walking, and opined he could sit for about two hours total in an eight-hour workday. (Tr. 1174.) Collar further stated that "no prolonged sitting is recommended." (Tr. 1175.)

During multiple mental health treatment sessions during 2021 and 2022, Plaintiff's providers observed that he was "grimacing in pain" (Tr. 1064, 1071, 1076, 1673) and described "psychomotor activation due to pain" (Tr. 1064).

6

In July 2022, Plaintiff reported to Brzezinski that he continued to experience pain to the left buttock and that "sitting is worse than standing." (Tr. 1624.) In August 2022, in response to a request from Plaintiff's sister to complete a disability form on Plaintiff's behalf, Brzezinski responded with a letter referring to the November 2021 functional capacity evaluation where Gutzman found Plaintiff could sit occasionally and stated that her "recommendations as far as what the patient can and cannot do are consistent with" the previous evaluation. (Tr. 1653–54.) Then, the month before Plaintiff was found disabled, in February 2023, he reported to Brzezinski that soon after engaging in a prolonged period of sitting while ice fishing, he was in excruciating pain and was confined to his bed for eight to nine days due to an inability to stand. (Tr. 2160.) He was described as being "tearful" with pain at a level of 10 out of 10 during the flare-up. (*Id.*)

ALJ Rouf acknowledges that Collar opined Plaintiff could sit for about two hours total but noted that he was not adopting her more restrictive sitting opinion. (Tr. 1273–74.) In so doing, the ALJ found Gutzman's opinion somewhat persuasive, noting that it was consistent with sedentary level work, specifically a "relatively good ability to sit and stand." (Tr. 1273.) He stated that Gutzman found Plaintiff limited to occasional walking, frequent standing, and frequent sitting. (*Id.*) ALJ Rouf then found Brzezinski's opinion similarly somewhat persuasive, as she relied on Gutzman's assessment, again noting that Gutzman found a "relatively good ability to sit and stand." (Tr. 1273.) But that is not what Gutzman found or opined. Rather, Gutzman noted that Plaintiff stated that "prolonged sitting" was by far his "hardest activity" and that Plaintiff demonstrated correlating pain behaviors during the test, such as avoidance of sitting. (Tr. 1180.) Furthermore, Gutzman opined Plaintiff was limited to *occasional*—not *frequent*—sitting (Tr. 1186), which again, is defined as up to one-third of the

day (Tr. 1189). Gutzman's actual limitation to occasional sitting as well as his notation that Plaintiff had difficulty sitting during the test comports with Collar's two-hour sitting limitation and statement that he should avoid prolonged sitting.

ALJ Rouf's misstatements regarding Gutzman's findings and the inconsistency between the record evidence as cited above and the ALJ's finding that Plaintiff retained a "relatively good ability to sit" must be revisited on remand. A sedentary job by its very nature requires a great deal of sitting. Thus, if Plaintiff cannot sit for prolonged periods, it is unclear how he could perform sedentary work.

### 2.1.2   Overhead Reaching Limitation

Plaintiff also challenges the ALJ's RFC limitation to occasional overhead reaching with the bilateral upper extremities. He argues that Gutzman opined that Plaintiff could reach both overhead and forward only occasionally (Tr. 1186) while Collar similarly opined Plaintiff could reach overhead and forward up to 33 percent of an eight-hour workday (Tr. 1175), or in other words, occasionally. Brzezinski, in contrast, opined that Plaintiff "may do occasional reaching," without delineating between overhead or forward reaching. (Tr. 1653.) Plaintiff contends the ALJ failed to explain why he did not also limit him to occasional forward reaching. (Docket # 15 at 14.) Because the VE testified that the Dictionary of Occupational Titles ("DOT") does not delineate between forward and overhead reaching and thus based the available jobs on his professional experience (Tr. 1313), Plaintiff contends that it is unclear whether he could perform the jobs the ALJ relied upon if he could only occasionally reach overhead *and* forward (Docket # 15 at 15).

In finding Gutzman's opinion somewhat persuasive, ALJ Rouf cites the opinions regarding occasional forward reaching and occasional working with arms overhead while

standing. (Tr. 1273.) In the RFC, however, he includes only a limitation to occasionally reaching overhead. (Tr. 1267.) While the ALJ states that Gutzman's opinion supports limited postural maneuvers (Tr. 1273), the decision does not address any of the manipulative limitations. Thus, because it is unclear and this matter is being remanded anyway, the ALJ should address whether an additional limitation for forward reaching is warranted, and if so, whether it changes the jobs available.

### 2.2    The ALJ's Mental RFC Finding

ALJ Rouf determined Plaintiff had the severe mental impairments of major depressive disorder, ADHD, generalized anxiety disorder, and social anxiety disorder. (Tr. 1263.) In assessing the "paragraph B" criteria of the Listings, the ALJ determined that Plaintiff had moderate limitations with regard to concentrating, persisting, or maintaining pace. (Tr. 1266.) He stated that he limited Plaintiff to understanding, remembering, and carrying out simple instructions and maintaining attention, concentration, persistence, and pace for two-hour segments to account for these limitations. (Tr. 1269.) Plaintiff argues the ALJ failed to explain how the evidence led to his RFC limitations or how those limitations account for Plaintiff's specific limitations in concentration, persistence, or pace. (Docket # 15 at 15–16.) Plaintiff contends that limiting him to maintaining attention, concentration, persistence, or pace for two-hour segments is really no limitation at all, because SSR 96-9p explains that sedentary work already involves a person remaining seated for about six hours in an eight-hour workday, with a morning break, lunch break, and afternoon break, all of which are at about two-hour intervals. (*Id.* at 16; SSR 96-9p, 1996 WL 374185, at *6.) The Commissioner counters that even if a two-hour segment limitation is truly "no limitation at all," it does not matter because

nothing "requires that a moderate limitation have a concomitant restriction in the RFC assessment." (Docket # 16 at 9.)

The Commissioner's argument is unavailing. ALJ Rouf found Plaintiff had moderate limitations with concentration, persistence, or maintaining pace, and *did* attempt to account for these limitations in the RFC. The question, then, is whether the ALJ built a logical bridge between his RFC findings and the evidence. While I can trace the ALJ's reasoning for limiting Plaintiff to simple instructions, it is not entirely clear how the limitation to concentration for two-hour increments accounts for his lack of ability to sustain concentration.

In finding only moderate limitations, ALJ Rouf explained that Plaintiff's activities of daily living required at least some degree of concentration, persistence, or pace, such as driving and watching television. (Tr. 1266.) He explained that while Plaintiff expressed concern with staying focused and maintaining attention, he took medication for his ADHD and presented with normal attention and concentration upon examination. (*Id.*) ALJ Rouf further explained that he found the opinions of State Agency psychological consultants, Dr. Ellen Rozenfeld, Psy.D., at the initial level (Tr. 1365) and Dr. Soumya Palreddy, Ph.D., at the reconsideration level (Tr. 81), somewhat persuasive (Tr. 1272). Both opined Plaintiff had moderate limitations in concentration, persistence, or pace. (Tr. 81, 1365.) Dr. Rozenfeld, however, further opined Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods, explaining that Plaintiff's "ability to carry out tasks with adequate persistence and pace would be moderately impaired for complex tasks but adequate for completion of detailed tasks" (Tr. 1371). In contrast, Dr. Palreddy further opined Plaintiff was moderately limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and in the ability to

10

complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, explaining that Plaintiff "may have increased difficulty maintaining a normal workweek due to interfering effects of depression, but he would generally be able to maintain a normal 40-hr workweek and be expected to be off work less than 1 day/month." (Tr. 85).

ALJ Rouf stated that while not wholly adopting the State Agency doctors' stated limitations, he found them somewhat persuasive because of their consistency with the records supporting mental health treatment, improvement with medication, and generally good mental status examination findings. (Tr. 1272.) And while the RFC limitation to understanding, remembering, and carrying out simple instructions seems to account for Dr. Rozenfeld's opinion that due to Plaintiff's moderate limitations in the ability to maintain attention and concentration for extended periods, he would not be able to perform complex tasks, it is otherwise unclear how the limitation to concentration for two-hour segments properly accounts for his moderate difficulties in maintaining concentration, persistence, or pace. Thus, the ALJ should re-examine this on remand.

### 2.3    Evaluation of Subjective Symptoms

Plaintiff argues the ALJ erred in evaluating his subjective symptoms. The Commissioner's regulations set forth a two-step test for evaluating a claimant's statements regarding his symptoms. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.*

11

If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. *Id*.

Plaintiff argues ALJ Rouf mischaracterized the record when he found Plaintiff retained relatively good physical and mental functioning. (Docket # 15 at 19–29.) Specifically, he argues the ALJ ignored records noting abnormal examination findings, both physical and mental, and failed to consider his limitations in performing activities of daily living. (*Id*.) Because this case is being remanded on other grounds, I will only briefly address this argument.

It is well-settled that although an ALJ need not address every piece of evidence in the record, he may not ignore an entire line of evidence contrary to his ruling. *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020). As to Plaintiff's physical and mental impairments, he argues the ALJ unduly focuses on the records showing relatively good functioning and ignores those records demonstrating abnormal functioning. This is not the case. ALJ Rouf spends an entire paragraph summarizing records with abnormal physical examination findings, including the inability to tandem walk, tenderness upon palpation, and decreased sensation. (Tr. 1268.) Similarly, as to his mental health records, ALJ Rouf cited to Plaintiff's reports of passive suicidal ideation expressed throughout the relevant period, as well as negative findings upon

12

mental status examinations. (Tr. 1269.) Thus, I do not agree the ALJ ignored an "entire line of evidence" contrary to his ruling.

As to the ALJ's reliance on Plaintiff's activities of daily living, however, the ALJ should re-evaluate this on remand. ALJ Rouf concluded that the record demonstrates Plaintiff has better functioning than his allegations of disabling symptoms would indicate, pointing to such activities as "doing some housework," "doing some yardwork," "babysitting his grandchildren a couple of days per week," "camping," "hunting," and "driving." (Tr. 1271.) While I agree that in many circumstances, these activities would indeed undermine a claimant's allegations of disabling symptoms, the record here paints a different picture. Plaintiff worked a physically demanding job for nearly 30 years. (Tr. 836.) Plaintiff told his treating therapist that working "was his outlet" and that he hoped to someday return to work. (Tr. 873.) Plaintiff expressed this desire on multiple occasions, but stated his pain was preventing it. (Tr. 836, 873, 875.) Plaintiff also enjoyed very physical hobbies such as hunting and fishing, but stated that he could no longer do the activities because of pain. (Tr. 837.) Yet, it appears Plaintiff continued to try to push himself to perform physical activities, noting that he would, for example, do yard cleanup "as much as tolerated until noticing back pain." (Tr. 2459.) However, when Plaintiff did go ice fishing in February 2023, shortly thereafter, Plaintiff was bed-bound for eight to nine days due to pain he attributed to the fishing trip. (Tr. 2160.) And while Plaintiff reported "babysitting" his grandchildren once a week, it is unclear the level of physical activity this entailed, as his brother and sister-in-law, as well as his father, lived in the same house with him at that time. (Tr. 2450–51.) Thus, on remand, the ALJ should be careful to consider the entire picture of the activities performed before relying on them to discount Plaintiff's allegations of disabling symptoms.

### 2.4    The ALJ's Step Five Analysis

Finally, Plaintiff argues the ALJ's step five finding is not supported by substantial evidence. Because this case is being remanded to address issues with the proceeding steps in the five-step sequential disability analysis, the analysis at step five will likely change. However, as Plaintiff makes several legal arguments challenging the ALJ's step five analysis, I will address the issues to provide guidance on remand.

At step five, the Commissioner bears the burden of presenting evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in significant numbers in the national economy. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). "In the context of job-number estimates . . . the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018). To meet this burden, "the agency often relies upon VEs to assess a claimant's ability to engage in certain activities." *Fetting v. Kijakazi*, 62 F.4th 332, 337 (7th Cir. 2023). And when the Commissioner satisfies this burden through expert testimony from a VE, the testimony must be reliable—"A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008).

In finding Plaintiff not disabled prior to March 29, 2023, ALJ Rouf relied on the VE's testimony regarding three jobs listed in the DOT available for a worker with Plaintiff's stated RFC—document preparer, lens inserter, and final assembler. (Tr. 1276.) Plaintiff argues that the job of document preparer is obsolete; thus, the ALJ should not have relied on it. (Docket # 15 at 5.) He argues that the job of a lens inserter, as described by the DOT, requires the person to work around a conveyer belt passing under heating lamps, which is inconsistent

14

with the RFC prohibition of working around dangerous moving machinery. (*Id.* at 8–9.) And as to the final assembler job, Plaintiff argues that the availability of 4,000 jobs alone does not constitute a "significant" number of jobs. (*Id.* at 9–10.)

### 2.4.1 The ALJ's Reliance on Document Preparer Occupation

Plaintiff challenges ALJ Rouf's reliance on the job of document preparer, microfilming, DOT # 249.587-018, arguing the job is obsolete and thus cannot support his step five finding. Although the DOT is still frequently used in adjudicating Social Security disability claims and there is no Seventh Circuit precedent finding that reliance on it is *per se* error, it is readily accepted that the DOT, last updated in 1991 and generally containing information describing jobs as they existed in 1977, is outdated, if not downright obsolete. *See Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). As the Seventh Circuit noted in *Browning*, "[n]o doubt many of the jobs have changed and some have disappeared. We have no idea how vocational experts and administrative law judges deal with this problem." *Id.* In fact, the U.S. Department of Labor states that the O*Net "is now the primary source of occupational information" and that the Social Security Administration is in the process of developing a new Occupational Information System intended to replace the DOT as the primary source of occupational information for adjudicating Social Security disability claims.[1]

On January 5, 2025, the Administration issued Emergency Message ("EM") 24027, explaining that certain jobs listed in the DOT may refer to job materials or processes that have been replaced by more modern ones. Thus, before an ALJ can cite any of the DOT occupations on the list to support a finding of "not disabled," the ALJ must obtain additional evidence from a VE supporting the ALJ's conclusion that, as the occupation is currently

---

[1] https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT (last visited Dec. 23, 2025).

performed, its requirements are consistent with the claimant's RFC and that it exists in the national economy in numbers that alone, or in combination with work in other cited occupations, are significant.[2] Of the three jobs ALJ Rouf concluded Plaintiff could perform, the job of document preparer, microfilming (DOT # 249.587-018) appears on the list.

While Plaintiff acknowledges that EM-24027 was not in place at the time of ALJ Rouf's decision, he argues that Social Security Ruling 00-4p was effective at that time and this ruling required the ALJ to resolve any obvious inconsistencies between a VE's testimony and the DOT, and ALJ Rouf failed to do so. (Docket # 15 at 6–7.) SSR 00-4p, which was rescinded and replaced with SSR 24-3p effective January 6, 2025, provided that occupational evidence from a VE should generally be consistent with the occupational information supplied by the DOT and when there is an apparent unsolved conflict between VE evidence and the DOT, the ALJ must elicit a reasonable explanation for the conflict in supporting his disability decision. SSR 00-4p, 2000 WL 1898704.

At the administrative hearing, VE Heiman was asked whether a hypothetical individual with the limitations ALJ Rouf ultimately found to be Plaintiff's RFC could perform any work. (Tr. 1311.) VE Heiman responded with "document preparer, microfilming," but noted he needed to make "a preliminary statement." (*Id.*) The VE explained that technology advanced greatly over the decades since the description was written in the DOT and stated that while the job remains in the economy, the tasks are much simpler. (*Id.*) The VE testified that the tasks of "microfilming" include the use of computers and scanners as we know them today. (*Id.*) ALJ Rouf then followed-up with VE Heiman regarding the document preparer job, stating that "I know you said the job today is largely done differently than how it's

---

[2] https://secure.ssa.gov/apps10/reference.nsf/links/01062025092030AM (last visited Dec. 23, 2025).

described in the DOT. Given that though, as the job is done today, that still meets the limitations and restrictions in the hypothetical that I gave you?", to which the VE responded, "Yes. It certainly fits within that framework." (Tr. 1312.) ALJ Rouf then asks VE Heiman whether his testimony was consistent with the DOT, to which the VE responded as follows: "Yes, it has been, Your Honor, for anything contained in the DOT and in my testimony. My testimony is consistent, except, of course, as we discussed previously because of the factual existence of entirely different technology now from when it was originally described." (Tr. 1313.) He further testified that some portions of his testimony was also based on his professional experience. (*Id.*)

Plaintiff argues that because VE Heiman specifically indicated that the job of document preparer as done today conflicts with the description in the DOT, there was an obvious conflict that ALJ Rouf was required to resolve pursuant to SSR 00-4p. (Docket # 15 at 7.) Although acknowledging that ALJ Rouf asked about the inconsistency and VE Heiman provided an explanation, he argues that ALJ Rouf merely "accepted the VE's testimony, at face value, without any further inquiry or explanation," such as by asking whether the VE personally observed the document preparer job as it is currently done. (Docket # 17 at 2.)

I disagree. As cited above, ALJ Rouf questioned VE Heiman regarding the discrepancy between the job of document preparer as described in the DOT and how it is performed today, and the VE explained that the job involves much simpler work using modern computers and scanners. When asked whether his testimony was consistent with the DOT, the VE explained the inconsistencies with the document preparer job but agreed that, as performed today, it is consistent with the hypothetical individual's RFC. While Plaintiff contends that the ALJ "merely accepted the VE's testimony at face value," part of a VE's

17

expertise comes from his professional experience. As the Supreme Court stated, "When offering testimony, the experts may invoke not only publicly available sources but also 'information obtained directly from employers' and data otherwise developed from their own 'experience in job placement or career counseling.'" *Biestek v. Berryhill*, 587 U.S. 97, 100 (2019) (internal quotations and citations omitted). Before relying on the VE's testimony, the ALJ explained the conflict between the DOT's description of document preparer and the VE's explanation of how the job is performed today and explained why he found the VE's testimony reliable. (Tr. 1276–77.) Thus, I do not find the ALJ erred in this regard.

Nonetheless, the ALJ should proceed with caution if he continues to rely on this occupation upon remand. EM-24027 now *does* apply, and given the difficulties with this occupation, it may be best to avoid relying on it altogether.

### 2.4.2   The ALJ's Reliance on Lens Inserter Occupation

Plaintiff further challenges the ALJ's reliance on the VE's testimony regarding the availability of the lens inserter occupation, DOT # 713.687-026. The DOT describes this occupation as follows: "Fits lenses into plastic sunglass frames and places frames on conveyor belt that passes under heat lamps which soften frames preparatory to setting of lenses." Lens Inserter, DICOT 713.687-026, 1991 WL 679273. Plaintiff argues that this job is inconsistent with the RFC restriction of avoiding dangerous moving machinery. (Docket # 15 at 8–9.) Interestingly, despite the presence of a conveyor belt, the DOT does not classify this job as involving moving mechanical parts, stating "Moving Mech. Parts: Not Present - Activity or condition does not exist." Lens Inserter, DICOT 713.687-026, 1991 WL 679273.

Plaintiff points to several district courts that have questioned this seeming discrepancy. For example, in *Cody M. v. Saul*, the ALJ gave substantial weight to the opinion of a medical

expert who testified at the administrative hearing that the Plaintiff should "never be around moving mechanical parts." No. 119CV01181JRSMPB, 2020 WL 1149596, at *3 (S.D. Ind. Mar. 9, 2020). The ALJ, however, relied on the VE's testimony that one of the representative occupations the plaintiff could perform was "lens inserter," DOT # 713.687-026. *Id.* While the court noted that the "lens inserter" job was described as indicating that moving mechanical parts were "not present" with the performance of the occupation, the court concluded that this was a conflict better resolved by the initial factfinder with the assistance of the VE. *Id.* Other courts have similarly questioned how one who is restricted from working with dangerous moving machinery can simultaneously work with a conveyer belt. *See, e.g.*, *Ross D. G. v. Saul*, No. 3:20-CV-00274-MAB, 2021 WL 4403095, at *9 (S.D. Ill. Sept. 27, 2021) ("[T]he Court cannot say that a conveyer belt is not dangerous moving machinery, as there is nothing in the record to indicate that it isn't."); *John C. v. Kijakazi*, No. 419CV04111SLDJEH, 2022 WL 20211113, at *5 (C.D. Ill. Jan. 5, 2022) (finding "where the RFC restricted exposure to 'dangerous moving machinery,' remand was necessary for the ALJ to determine whether jobs involving machines such as conveyor belts conflicted with the VE's testimony that a person with the claimant's RFC could perform them").

The Commissioner argues that simply because there is a conveyer belt involved with the lens inserter job, that does not mean that the conveyer belt is "dangerous moving machinery." (Docket # 16 at 5.) Furthermore, he argues that the VE testified that the lens inserter job did not involve dangerous moving machinery. (*Id.*) The Commissioner argues that the court should "ignore plaintiff's attempt to cast himself as the vocational expert whose opinion should override both the actual expert and the DOT." (*Id.*) While I acknowledge that the DOT's description indeed states that moving mechanical parts are not present in the lens

inserter job, I agree with the courts that have determined this to be an apparent conflict the ALJ is required to resolve under SSR 00-4p. *See John C.*, 2022 WL 20211113, at *3–4. Perhaps the conveyer belt used in the lens inserter job is not "dangerous" moving machinery and thus is consistent with Plaintiff's RFC. This, however, was a conflict the ALJ should have elicited an explanation about from the VE. Thus, the ALJ erred in relying on the 14,000 lens inserter jobs when finding Plaintiff not disabled. Once again, if the ALJ again relies on this job on remand, this issue must be addressed.

### 2.4.3   Whether a Significant Number of Jobs Remain

At step five, the Commissioner must show that work exists in significant numbers in the national economy that the claimant can perform. *Ellis v. Kijakazi*, 553 F. Supp. 3d 628, 631 (E.D. Wis. 2021). Plaintiff argues that once the document preparer and lens inserter jobs are eliminated, the ALJ is left with only the final assembler job, of which there are only 4,000 jobs available nationally. (Docket # 15 at 9.) He argues that 4,000 jobs is not "significant" to uphold the ALJ's finding.

Because I disagree that the ALJ erred in relying on the document preparer job, the aggregate number of jobs available is 24,000 jobs nationally (omitting the 14,000 lens inserter jobs). The question, then, is whether 24,000 jobs is significant. Although courts in this circuit have noted a lack of guidance from the Seventh Circuit in establishing a threshold number of jobs that qualifies as significant, *see Ellis*, 553 F. Supp. 3d at 633, the court of appeals did offer some guidance more recently in *Milhem v. Kijakazi*, 52 F.4th 688 (7th Cir. 2022). In *Milhem*, the court stated that at step five, "[i]n determining whether there is a 'significant' number of jobs in the national economy, the regulatory scheme gives the ALJ discretion to decide, using substantial evidence, when a number of jobs qualifies as significant." *Id.* at 696. The court

further noted that while there is no "clear baseline for how many jobs are needed," it found that the number the ALJ arrived at in that case—89,000—was in accord with the numbers of national jobs held to be significant by other circuits, citing *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (32,000 national jobs); *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (25,000 national jobs); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (10,000 national jobs); and *Weiler v. Apfel*, 179 F.3d 1107, 1110–11 (8th Cir. 1999) (32,000 national jobs). *Id.* at 697.

While 24,000 jobs nationally does indeed seem low, given the court of appeals' more recent guidance in *Milhem*, I cannot say it is insignificant at step five. The ALJ explained that the VE provided a reasoned and principled explanation of his methodology to arrive at his job estimate numbers and that given Plaintiff's age, education, work experience, and RFC, he was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (Tr. 1276–77.) Thus, while the ALJ likely did not err at step five, *see, e.g. Wegerer v. Kijakazi*, No. 22-CV-123-JDP, 2023 WL 6307407, at *7 (W.D. Wis. Sept. 28, 2023) ("Finally, although it's on the low side, 23,600 jobs nationwide falls within the range that courts in this circuit, including this one, have found significant."), upon remand, the Commissioner could avoid this argument from being raised if the VE can provide a larger number of available jobs.

## CONCLUSION

Plaintiff argues the ALJ's decision finding him not disabled is contrary to the substantial evidence in the record. I agree that remand is warranted to address the ALJ's evaluation of Plaintiff's physical and mental limitations in his RFC and his subjective symptoms. Thus, this case is remanded for further proceedings.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of December, 2025.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge